May it please the Court. When a surety issues a performance bond, it is making the decision to guarantee that a specific principal will perform a specific contract for a specific obligee. In this case, Liberty unilaterally changed both the contract to be performed and the obligee for whom it was to be performed. It made those changes not only without IFIC's consent, but over IFIC's express objection. Those alterations terminated IFIC's obligation to bond the ratification agreement. Correct, Your Honor. That's not an objection, unless there's a letter stating specific, contemporaneously stating specific problems and urging a different course of action. Well, Your Honor, the only communication that IFIC received was from its principal and never received a communication from... You mean it didn't know what was going on? It absolutely knew. It knew that its principal brought it, the draft of the ratification agreement, and the bond cover this agreement. And IFIC's answer to that question was no. But that's the only opportunity IFIC ever had. I just want a correcting objection. I think that would be a different fact scenario than what we had. Absolutely, Your Honor. I think we agree on what the facts are. Absolutely. Those alterations terminated IFIC's obligations under its bond, told otherwise undermines a surety's freedom to contract. Liberty's position is based on the doctrine of equitable subrogation, a powerful tool for any surety, but it has its limits. Two of those limits are that equitable subrogation cannot overcome the express provision of another bond, and a surety cannot be equitably subrogated to anything more than its principal had at the time of the surety's performance. What's the case for the first principle? That doesn't ring a bell. Well, Your Honor, those cases are, in fact, numerous in all the cases that we've cited, including Kull, Burrett, Noyes, that talk about the fact that a surety's liability in any project does not stem from tort, does not stem from a negligence theory. The surety's only involvement is based on its bond. It is entering into an agreement to say, we will be liable. But in exchange, the surety has the absolute right to define that liability pursuant to its bond. So we have numerous cases in the briefing that stand for the proposition that a surety is entitled to stand to strict adherence with its bond. I know that, but equitable subrogation is an override. Well, Your Honor, this Court decided in U.S. for the use of First Continental National Bank and Trust that subrogation was denied where the granting of subrogation would result in stretching the coverage of the bonds beyond their clearly defined limits. So if we need to dis— But that didn't happen here. Your Honor, there is a clearly defined limit— I mean, unless you win some of the contract issues on the merits, that didn't happen. The District Court didn't think that happened. Well, Your Honor, the District Court did go through an analysis to deal with one of the clearly defined limits in the IFIC bond. And that limit was the provision that no right of action shall accrue in this bond to or the use of any person or corporation other than the obligee named herein or the heirs, executors, administrators, or successors of the obligee. And what the District Court had to decide was, is— Now, the District Court didn't take an unadorned application of the doctrine of equitable subrogation and decide, that provision doesn't matter. We can blow through that using the tool of equity. Instead, what it made the decision was, can we use equity to conform somehow liberty to meet that provision? And there's only one of two ways that you could do that. Are you arguing a successor issue? Because you just distorted that, I think. My question on the successor is, why is everybody looking to Iowa statutes in other contexts like corporations when we're interpreting the terms of a bond? Well, Your Honor, the parties have— So the context ought to be the interpretation of the term of the bond as Iowa interprets contracts and bonds. I don't care what successor means in corporate law context. What should a surety and its customer think that means? In the context of equitable subrogation as being an accepted part of the world, surety world, I would think the subrogate is clearly a successor in the contemplation of the bond parties. Well, Your Honor, that's an exceptional point that IFIC when it's drafting a subcontract bond as a surety itself— Let me put it this way. Your opposing counsel's brief says that's what all the cases say. Now, I didn't read the case. But you didn't have any case to the contrary. Have you got one that says what I just said is wrong? There are two answers to that question, Your Honor. The first answer, looking at the cases, is there's one case that does address that issue under Florida law, and that's Argonaut. The other cases that counsel has cited are distinguishable. I asked if you have a case. Have you got a positive or are you just pounding on the negative? Your Honor, there's not a provision where courts have taken up— an Iowa court or another court has taken up this particular bond language. Now, the language that I just cited is unique and not common in bonding. So when we see a lot of other bond cases— How do we know that? Well, Your Honor— This is not an ISO document? Correct. It's not a standard bond. This provision is not part of the ISO document or the standard bond form. So when we look at, for instance, the California cases, we don't have the luxury of knowing exactly what those provisions were, but it's also important to note that in those cases, often either the general contractor is not in default or the principal and the sureties were all parties to those cases, both the general contractor in its surety and the subcontractor in its surety. But on your successor argument, if you take your successor argument to its logical conclusion, the owner would never be able to collect on a bond of a subcontractor when the general contractor fails because there's always going to be either the owner has to step in and finish the project or the owner has to hire another general contractor to finish the project. So are you saying that these bonds are of no value when the general contractor is in default and fails? Your Honor, if the general contractor fails first, frankly, that's not the risk that we bond. There's a condition proceeding, which has been upheld in other decisions. Well, what if they fail simultaneously? Or what if it's because of the bad workmanship of the subcontractor that the general ultimately fails? You're saying that this bond is worthless in that situation. No, Your Honor, that's not our position. What you're describing were the facts of Menora, which is another decision where the court decided in equity the surety for the general contractor had equitable subrogation against the persons who caused the general to fail. So if there's causation, that weighs heavily in the calculus of equity doing what is right. And that's not what we have here. What we have here is a situation where the general failed first. At the time of the general's failure, the evidence is uniform that both the federal government and the general contractor believe that the subcontractor, International Electric's work at that time was fine. Why wouldn't the owner have the right to collect on the bond of the sub if the sub, as it turns out, does not fully perform in their contract? If the owner has to step in to take over for the general, why should that bond be worthless at that point? Your Honor, if that's the decision that occurs, again, the bond, the surety, has the ability to insist on the strict interpretation of its bond. But why shouldn't that be a successor? To me, that seems like the logical successor is the owner. If the general fails and the owner has to go in and finish the project, it would seem who else would be a successor other than the owner? What does that term mean? Sure. Your Honor, that term refers to the fact that as projects are going on, if a subcontractor were, for instance, to change its name, were to merge, were to be bought by another corporation, then they should have to go out and redo all their bonds in every project. Those bonds should continue unbroken. Does the bond say that someplace? Well, Your Honor, it says it when it uses the word successor. Well, when they use the word successor, and I know that Judge Loken doesn't want to get back to general contract principles, but in Sun Valley it clearly says that a successor may, in fact, be someone who stands in the place of, or one who assumes and sustains like part or character. And isn't that exactly what happens when, you know, the general fails for no apparent reason related to the sub's work, and the owner steps in? That's all that's happened, right? I mean, and what is the person? I mean, I get when you argue there's a personal relationship with the sub, that you know the subcontractor, that you have some understanding of the work and the quality and the workmanship that they do, and that that's the person who you're bonding. But whether the bond pays to the general or the owner, how does that change affect negatively your client's position? And why should it matter to us? Why should it matter that the general contractor has failed? Yeah. Sure. There's a couple of reasons for that. One is that the one is a condition proceeding under the bond that the time of the subcontractor's default, the general contractor is performing. But number two, the general, as happened here, the failure of the general contractor results in a termination of the subcontract that IFIC bonded. Remember, under that subcontract, the general, that subcontract is a bilateral agreement, it's a two-way street. The general has to do things in order for the sub to operate. So the general has to, for instance, be on the job directing labor. The general has to be paying the subcontractor. And when the general, as happened here in 2013, stops doing those things, the subcontractor has no choice but to default. So the opposite is actually true. When the general defaults, every subcontractor will default by necessity. And that's what happened here. Everyone left the job for several months. If every sub defaulted, then aren't you liable under the bond? Because now there's a default. Your Honor, the reason we need the condition proceeding that the general has to be Otherwise, the result would be not that the subcontractor's bond is illusory, but the general contractor's bond is illusory. If any time a general defaults, Liberty can step in and say, Well, every sub defaulted, so let's pass the hat. Every sub's surety has to come in, even though those subcontractors did nothing wrong, even though they were not the first to breach their agreement. Every subcontract surety is now going to be on the hook because the general contractor failed through no fault of the surety. And that's the result we need to avoid. And we avoid that in two ways. One is, again, the condition proceeding in the bond that the general has to be performing. The risk that the general stops performing is the risk Liberty bonded. So it's not unfair to them when that happens to make them pay for the consequences of that failure. The risk that IFIC bonded was that the project's moving along well and for the fault of our subcontractor, it falls off the job. Now we've got to pay to bring someone back in and to catch up with the rest of the job that's progressing. And that's important because we have to look at equitable subrogation again. What is Liberty equitably subrogated to? And when do they get it? And the district court agreed on this point that Liberty's status as the general contractor's surety doesn't get them anything, doesn't get them equitable subrogation. They earn equitable subrogation by performing the general contractor's obligations. Now they started to do that at the earliest in January of 2014, which is when they enter into the takeover agreement with the government and start rehiring folks and start actually doing the work. So the very, very earliest time that they can get equitable subrogations at that time. So let's assume that in January 2014, they get every right that their general contractor, Greenleaf, had in January of 2014. But let's take the clock backwards now. In December of 2013, Greenleaf had walked off the job and for months prior to that, Greenleaf had not been paying subcontractors, including ours, International Electric. So now let's, to your point, pretend that in January of 2014, Greenleaf is somehow financially resurrected and they come back to Des Moines and they go to all the subcontractors and say, gentlemen, pursuant to your subcontracts, you need to get back on the job and get back to work. They would have no authority to make that claim because that subcontract was already breached and a party cannot breach a contract and then require the other side to nonetheless perform. Each of those subcontractors would perfectly be entitled to say, I'm not coming back to this job, I haven't been paid in months, you abandoned the project, our deal is done. You broke it and I went on to do other things. So if Greenleaf in January of 2014 didn't have the authority to force International Electric to perform or therefore didn't have the ability to force IFIC to pay for International Electric's performance, Liberty can't step in and somehow be subrogated to a greater right. They can't have the right to do something that Greenleaf itself didn't have the right to do. Once Greenleaf fails, it terminates by its own misconduct the subcontract between itself and International Electric. You didn't pay them for their work, you weren't managing it, you left the job, they left the job, which is exactly what would happen. Once Greenleaf loses the right to enforce that subcontract, Liberty doesn't have that right, and that no one has the right to force IFIC to come in and perform on a contract that someone else breached. So even if the equitable subrogation is entirely powerful and it puts Liberty in the exact shoes of Greenleaf, it gives them every right Greenleaf would have had, this just isn't one of them. And that's not Liberty's fault, it's not IFIC's fault, it's not International Electric's fault, it's the fault of Greenleaf. Once Greenleaf is out of the picture, equitable subrogation can't resurrect those rights. For instance, in the Leach opinion, which we cite, the court wrote that the court cannot revive a lost security not then belonging to the creditor and transfer it by the process of subrogation to a surety. And since the briefing was submitted, the district court in Maryland commented on this point in a case, Day v. United Bank, which was handed down on August 3 of 2018, citing the Lumberman's opinion from 2011 in the Federal Circuit Court, the court in Day wrote, critical to the court's analysis, the rights for which a subrogee... It is not, Your Honor, because it was handed down after the briefing. Say that again? Oh, yeah, 28J letter, yes, Your Honor. We did not yet, but we certainly could. And Day v. United Bank, the court wrote, critical to the court's analysis, the rights for which a subrogee can recover are limited to those the subrogor possessed at the time of subrogation. So, again, that is one of the limitations I spoke of earlier to equitable subrogation. One limitation is... And I don't think it's challenged as a matter of principle that the subrogor can only hand to the subrogee that which it itself has. So liberty can't be in a better position in January of 2014 than Greenleaf was in January of 2014. And Greenleaf's position in January of 2014 was that it had breached all these contracts. I see that my time has expired. I didn't argue in that way to the district court. I didn't see the argument framed that way in either the district court's opinion or any of these briefs. Your Honor, we did cite the Leach citation... Citing cases does not substitute for just explaining what's going on. And the explanation was twofold to the lower court and in the briefs. One is, again, our argument repeatedly that there's a condition precedent to coverage that the general contractor has to be performing at the time that the subcontractor is declared in default. And the second, the argument that we made, and the quotation I read you is exactly cited in the reply brief, that the subrogation can't get anyone more than what someone else has had. And those arguments were made at the district court and they're made in the briefs to this court. Anyway, I see that my time has expired. Thank you. Ms. Smith? Good morning. May it please the Court? You need to address that last point for me. That strikes me as very powerful. The timing of the subrogation? That your client did not earn the right to subrogation until the general had long been in default and would not have been in a contractual position to force the subs to continue performing. Subrogation rights arise upon performance and as of January 2, by performance, by the surety. When Liberty completed the prime contract work, which included Greenleaf's, or which included Electric's subcontract works, it became fully subrogated. But the subrogation rights relate back to the time that the bond was entered into by Liberty in March of 2014, which predates everything that happened in this case. I think we get the nature of the bond relationship. The real question is the assertion that Greenleaf had long since defaulted, defaulted far prior to the bond relationship actually becoming ripe, and that when that bond relationship became ripe and Liberty stepped into the shoes of Greenleaf, Greenleaf had in a prior instance, much earlier, breached the contract and the subs had in fact all abandoned the work site. And once we get to that point, Greenleaf is out of the picture. Liberty hires, the company starts with a vertex, and they enter into a series of negotiations about a contract and they're claiming that the reason that those negotiations were necessary is that there had already been a breach by Greenleaf and a new contract arose and that that constitutes an uncovered contract on the bond and that Liberty could assume no right that Greenleaf could have asserted. The only rights that they have is what Greenleaf could have asserted, and at that point, Greenleaf, in breach of its contract, could not have compelled the electric company to come in and perform the electric contracting work. I think the point that IFIC is overlooking somewhat by design is the effect of the ratification agreement. They're claiming that's a new agreement. They're not overlooking it. They're saying that when they ratify that contract, it's actually a new contract. It's got new parties. It's got the old time deadline, but payments are made, you know, and it's a large sum of money that's paid, which puts their bond at risk. There's an agreement that electric will perform the work for, I forget, $300,000 more or whatever that number was, and then now we're at one point something million, and what they're saying is that that kind of contract is not merely a ratification, go in and finish the work. What it is is that there's a new contract that's formed. Why are they wrong on that? They're wrong on that because they're ignoring the concept that parties to a contract have the right to cure the breach. And electric liberty cured. To the extent the breach is that Greenleaf left the project and no longer was serving as the general contractor, liberty performed that. To the extent the argument is that Greenleaf was in breach because Greenleaf had failed to make progress payments to electric, liberty cured that breach by making those payments and after stepping into the role of being the prime contractor and paying any amounts that liberty paid the amounts that by the terms of the ratification agreement electric claimed were owed to it for its work, in response to that, International Electric agreed that the subcontract was still in full force and effect and that it would continue it. Yes. Well, I believe that if the bond had, let's say that liberty had called International Electric and said, hey, will you bond, will you reaffirm your bonds or even add liberty as a named obligee on the bond and International had said, no, we won't do that, then Electric would have been immediately in breach of a subcontract that it agreed was in full force and effect because the subcontract required it to be bonded and we'd have the same lawsuit. What if the general, if they walk off the, how long do these contracts act when the general, do they continue to be enforceable when the general walks off and no work is being done? I mean, what if this had gone on for three years? Are all the subs now, okay, now we've substituted somebody, they've got to come back in and now we just resurrect all these agreements and materials have changed, cost deadlines have changed, labor's been changed, the market's changed. I mean, how long does this go on? That's the purpose of the ratification agreement is to work out those issues. But their claim is that's a new agreement. Why is it not a new agreement? I mean, here's what their argument is, just stripped down at least as far as I can figure it out, is that none of these subs could have been compelled to come back and finish this work because Greenleaf had breached and once Greenleaf had breached, no one was under any obligation to complete. And it appears that Liberty believed that since they picked and chose which of the subcontractors they wanted to come back. They didn't force everybody to come back and say, okay, you're all bound by your contract. Instead, they negotiated these new ratification agreements and the claim is that's a totally new agreement, not covered by the bond. Do you get that? I mean, that's what I get. I don't know if that's right or not. I get that. Yeah. Why is that wrong? That Liberty cured any breach of the subcontract. And so it remained in full force and effect. And it can do that with just. Excuse me. I didn't mean to talk over you. They can do that with anybody they wish. Because they only did it with some of the subs, but not all of the subs. We could only do it with subcontractors that agreed to do that. That ratified the subcontract. Exactly. That's the deal. If they could choose not to do it and not be in breach, then isn't it a new agreement? No, it's not a new agreement. It's a curing of the old agreement. But then how come you couldn't do it with everybody? I mean, all the subs. Here's the deal. If some subs could have said, forget you. I've got another deal I'm doing in Chicago. I got no time for this contract. I'm obligated. You breached it. We're out of here. And you're saying, well, you couldn't force those people back onto the job site. Well, if you can't force them back onto the job site without a new agreement, isn't it by definition a new agreement, not a ratification? I understand what you're saying. But here International Electric agreed that the subcontractor, the subcontract was still in full force and effect and that it would continue. And that's binding on its. And it's binding on the bond, right, as you're saying. It's binding on its surety. And if everything had come to a halt at that point, then Greenleaf at Liberty through its subrogation rights would have had a claim against the IFIC performance bond for International's failure to perform the subcontract. There was an agreement that Electric defaulted. And Liberty recovers, well, the damages of a million three, and they got the penal max on the bond, and yet the work to be performed under the ratification agreement was agreed, was only estimated to cost $350. So that tells me that the default that Electric has conceded was for pre-ratification agreement. Failure. Am I right? I think that's true. I mean, it could be that they underbid the work. I mean, there's a variety of reasons why the dollars changed. But, yes, and your point that the default of Electric was admitted in the case is also a good one. But I, so if Electric had gone out and gotten a new bond at the time of the ratification agreement. The new bond that would have been. It wouldn't have covered pre-ratification agreement defaults, right? Well, the subcontract required the bond to be in the total amount of the subcontract. So it would have had to be $1,020,000 is what the amount would have been. I mean, that's what the subcontract required. That's just base amount, but we're talking about contract. What bonding company would agree to that? I don't know that one would. So they may not have been able to ever be in compliance with the terms of the subcontract. Electric? Right. What if Electric had entered into a new contract with Liberty? In other words, they said, we're not willing to come back onto this job for what's owed on the original subcontract. As Judge Erickson said, now we've got a crew in Chicago. We've got to bring them back. We've got to buy some new equipment. The prices have gone up. Instead of $350,000, we want a half a million dollars or a million dollars to finish this project, and we want a new contract. Would you be arguing the bond would cover a new contract? Would the bond amount increase by? I'm not saying increase. Let's just say would it cover it at all. Would it even cover the first million? I don't think that would have been a material change. It would have been addressed in a change order setting, and typically subcontracts. Okay. Liberty goes to the electric company and says, will you come back on the job and finish the work? And they say yes, but not for what we said before because we have all these additional costs. We didn't get paid for three months. We want, instead of, I think the balance was about $347,000. Correct. We want a lot more than $347,000 to finish this contract, and we want a new agreement to finish this off. Right. Typically in the ratification process, if that comes up, what happens is prices are discussed. If there's increased material costs, that's addressed by a change order that increases the amount of the bond, or increases the amount of the subcontract, and you go down the road. International didn't do that, but in the ratification agreement, it reserved the right to assert a claim. It ultimately never identified what that claim was and put numbers to it, but that claim still existed so they could pursue that claim against Liberty in its role as the successor general contractor, and perhaps on the Miller Act bond also. In January 2014, the ratification agreement could not be negotiated, and I guess the general gets sued by the government or somebody for the default under the project, and all those cross-claims against all the subs. What would each bonding company have been responsible for when the dust cleared? Liberty would have been liable for the harm caused by its defaults, and Liberty could have recovered from general for what part of the damage was caused by its own failures, which the international bond would have covered. Is that basically right? Well, if I'm following you, on Liberty's prime contract bond, it would have responsibility to the government to pay or perform that work, but by doing that, it would have rights of actions against those subcontractors that failed to perform their scope of work if they were in default. Would the ratification agreement replace the way that part went? The ratification agreement cured. If that big lawsuit had happened, if a million three was the damages at that time, Liberty would have been responsible for the bulk of that, I suspect, since the general contractor was the principal defaulting party. Right, but then it would have subrogation rights against others who contributed to that occurring. You've managed through the ratification agreement without a new subcontract bond to shift all of that bond liability to a subcontractor's bond? Just for the portion of the electrical work. Liberty's damages in the overall project were much higher than that. Liberty's limited to only recovering. The electrical damages, are they anywhere quantified in the record, or is that just accepted, big numbers accepted as that's the way it worked out? Do we know how the million three came to be? We had a trial on damages where Liberty put on evidence of $1.3 million worth of— That's what I'm asking, is there a place in the record I can go and see how that was calculated and for what failures when? Yes, the district court's order sets out—you mean the underlying— Is that in the record on appeal? I don't know that it is. I don't know that the entire damaged trial transcript is. The trial transcript? Well, not the transcript, but the district court entered an order following the trial that sets out the computation damages. Okay, thank you. Thank you. I'll give you a minute if there's anything you think has to be replied to. Your Honor, just to say that once again, the issues here, I think, have touched on the changes in ratifications in addition to this wind subrogation accrues argument. I think the court's question has touched on the fact that after IFIC approved the subcontract, International Electric and Liberty went off and made this ratification agreement where they made decisions like, well, how much work has been done? We think it's 66%. How much work is left? How much is going to be valued? And this number of 347 is one that they arrived at without us, and yet they want to hold our bond, which was originally on a $1,020,000 contract, to this new $347,000 contract at a time when— remember, at the time that Greenleaf fails. Again, everyone agrees that Greenleaf believed there were no problems with International Electric's work. The government had no problems with International Electric's work. Everyone had been paid. Now all of a sudden Vertex comes in, and all this work needs to be redone, and that 347 is not good enough. Now we need a million. Point being, all these decisions are made without International Fidelity Insurance Corporation, and now they're being asked to pay for them. Thank you, counsel. The case has been thoroughly briefed and argued, and we'll take it under advisory.